**TAX INVESTMENTS, LTD. and Howard Harris, Plaintiffs,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Sun Savings and Loan Association, Defendant.**

**No. 88 C 4326.**

United States District Court, N.D. Illinois, E.D.

May 15, 1991.

George J. Anos, Bruce T. Logan, Yolanda M. Kielar, Ash, Anos, Freedman & Logan, Howard A. Harris, Chicago, Ill., for plaintiffs.

Albert Corneal Maule, Mary Kay McCalla, Hopkins & Sutter, P.C., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Tax Investments, Inc. and Howard Harris ("plaintiffs") brought this action against the Federal Deposit Insurance Corp. ("FDIC"), as receiver for Sun Savings and Loan Association ("Sun Savings"), for breach of contract alleging that the FDIC failed to fund plaintiffs as required by a loan agreement. The FDIC brought a counterclaim against plaintiffs for default on the loan agreement. The FDIC moves for summary judgment on the complaint and its counterclaim.

### FACTS

Prior to October 13, 1983, Sun Savings agreed to lend plaintiffs Howard Harris and Tax Investments, Ltd. $3.2 million on the condition that an Illinois financial institution would act as "lead lender" and would "sell" ninety-five percent of the loan to Sun Savings.

In October, 1983, First State Bank and Trust Company of Park Ridge ("FSB") agreed to become the lead lender by extending a loan of $3.2 million to plaintiffs to purchase delinquent tax parcels. The loan commitment required plaintiffs to provide FSB with a "participant" who would purchase a ninety-five percent participation in the loan. On November 8, 1983, plaintiffs reduced their loan request to $1 million.

On November 18, 1983, FSB and Tax Investments entered into a Revolving Credit Agreement and Note and a Security Agreement in which FSB agreed to extend

$1 million to Tax Investments. Harris executed a $1 million Personal Guaranty of the loan. On the same day, FSB and Sun Savings entered into a Loan Participation Agreement in which FSB sold ninety-five percent participation in the $1 million loan to Sun Savings.

On July 18, 1986, the Federal Savings and Loan Insurance Corporation ("FSLIC") was appointed receiver for Sun Savings pursuant to 12 U.S.C. § 1729(c)(2). In 1989, the FDIC, as manager of the FSLIC Resolution Fund, replaced the FSLIC as receiver for Sun Savings.

Plaintiffs have not made any payments on the loan since August 1, 1986. Plaintiffs say that its failure to pay on the loan was due to the FDIC's refusal to fund the perfection of unredeemed tax certificates after the two year redemption period had expired. Plaintiffs assert that Sun Savings was aware that plaintiffs sought funding for both steps of a two-step process: First, Tax Investments would purchase liens and obtain tax certificates on properties with unpaid real estate taxes. Second, after a two year redemption period expires, Tax Investments would obtain a deed to the real property by perfecting any tax certificates which had not been redeemed by the property owners. According to plaintiffs, Sun Savings had assured plaintiffs at the time of the initial loan that Sun Savings would loan additional funds to them so that Tax Investments could accomplish the second step—perfecting unredeemed tax certificates upon expiration of the two-year redemption period.

Specifically, plaintiffs assert that a loan commitment letter "reflects our understanding that Sun Savings would also fund the perfection of tax certificates" and that Harris wrote a letter to Sun Savings "expressing our understanding about what would happen on certificates which were not redeemed." (Harris Aff., ¶¶ 6–7.) The FSLIC, as receiver for Sun Savings, refused to fund a new loan to perfect the tax certificates. (*Id.* at ¶ 10.)

The FDIC, as receiver for Sun Savings, has moved for summary judgment on (1)

the complaint filed by plaintiffs and (2) FDIC's counterclaim against plaintiffs.

## DISCUSSION

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment the evidence of the non-movant must be believed, and all justifiable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## I. SUMMARY JUDGMENT ON THE COMPLAINT

The FDIC contends that there is no agreement in the loan documents that Sun Savings would loan additional funds to plaintiffs so that Tax Investments could perfect unredeemed tax certificates. Even if an agreement to so fund exists, the FDIC contends that *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and 12 U.S.C. § 1823(e) bar the enforcement of any unrecorded agreement of Sun Savings against the FDIC. Plaintiffs argue that a letter written by Harris to Sun Savings reflects the parties' agreement about future loans, that *D'Oench* is inapplicable here, and, in any event, Paragraph 11 of the loan commitment letter allows the additional funding requested by plaintiffs.

In *D'Oench,* the Supreme Court held as a matter of federal common law that an agreement that "was designed to deceive the creditors or the public authority or would tend to have that effect" was not enforceable against the FDIC if the result would be to impair the value of its asset.

62 S.Ct. at 681. In 1950, Congress codified in 12 U.S.C. § 1823(e) the principle established in *D'Oench.*[1] *See Federal Deposit Ins. Corp. v. Venture Contractors, Inc.*, 825 F.2d 143, 148 (7th Cir.1987). The purpose behind § 1823(e)

> is to enable the FDIC, in deciding to proceed with respect to a troubled bank, to make a quick and certain inventory of the bank's assets. It can do that only if it can disregard secret oral agreements that may impair the value of those assets.... The statute makes the common law principle [established in *D'oench*] both more encompassing and more precise. It requires that the agreement, to be effective against the FDIC, be written, be executed contemporaneously with the acquisition of the asset ..., be approved by the bank's board of directors or its loan committee, be noted in the bank's minutes, and, continuously from the time of execution, be an official record of the bank.

*Federal Deposit Ins. Corp. v. O'Neil*, 809 F.2d 350, 353 (7th Cir.1987).

■ Harris wrote a letter dated November 18, 1983 to Sun Savings "expressing our understanding" about borrowing additional funds in the future in order to perfect unredeemed tax certificates. (Harris Aff., ¶ 7.) However, this letter does not fulfill any of the requirements of § 1823(e). While the letter was written, it does not constitute an agreement since only Harris signed the letter. Furthermore, there is no evidence that the letter fulfilled any of the other conditions of § 1823(e). The letter from Harris is exactly the type of "agreement" § 1823(e) is designed to prohibit.[2]

■ Plaintiffs assert that Paragraph 11 of the Loan Commitment Letter of October 13, 1983 "reflects our understanding that Sun Savings would also fund the perfection of the tax certificates." (Harris Aff., ¶ 6.)[3] Paragraph 11 reads:

> 11. *Loan to Value Ratios:* In the event the tax sale is not redeemed the real estate will be owned by Borrower and the Lenders outstanding principal due on that parcel of real estate shall not be in excess of Twenty (20%) percent of the value of the real estate acquired and shall be improved property. All acquired real estate shall be disposed of within 120 days.

Plaintiffs contend that Paragraph 11 is controlling here because it "requires that all real estate acquired on perfection of the certificates had to be sold or disposed of within 120 days." (Harris Aff., ¶ 6.) This plaintiffs claim that "Sun Savings induced Tax Investments to purchase the forfeited tax certificates on its promise to fund their perfection." (*Id.*) The court is not relying on *D'Oench* directly, but on 12 U.S.C. § 1823(e), which codified the principle of *D'Oench.* Section 1823(e) declares that "[n]o agreement which tends to diminish or defeat the interest of the Corporation in any asset ... shall be valid against the Corporation...." It does not distinguish between revolving credit notes and participation agreements on the one hand, and loan commitment letters or other agreements on the other. Nor does it distinguish between lead lenders and participating lenders. Thus, the court believes that § 1823(e) is applicable to any agreement between plaintiffs and Sun Savings.

---

1. 12 U.S.C. § 1823 states:

   No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement

   (1) is in writing,

   (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

   (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

   (4) has been, continuously, from the time of its execution, an official record of the depository institution.

2. Plaintiffs argue that "*D'Oench* and its progeny have no relationship to the facts before this Court" because their claim is not a direct challenge to the loan documents or the Loan Participation Agreement. (Response, p. 3.) Instead,

3. Paragraph 1.2 of the Revolving Credit Agreement between FSB and Tax Investments incorporates "the terms and provisions of the Letters of Commitment" into the Revolving Credit Agreement. Furthermore, Paragraph 1.2 states that the provisions of the Letters of Commitment "shall be strictly adhered to."

provision does not speak to the issue at hand. Even if this paragraph only pertains to future loans made in order to perfect tax certificates, nothing in this paragraph *requires* such loans to be made. In fact, Paragraph 7 of the same document, entitled "Use of Funds," states that the funds are to be used to "Purchase Tax Parcels." There is no mention of using funds to perfect tax certificates. Additionally, Paragraph 8 of the letter states that "[f]inal funding shall be accomplished on or about September 15, 1984." This date is prior to the expiration of the two-year period during which property owners may redeem their properties and after which plaintiffs requested additional funds to perfect unredeemed tax certificates.

Plaintiffs have pointed out no other provision in any of the loan documents which reflects an understanding about future loans. Thus, the court believes that, as a matter of law, there was no agreement to fund future loans to plaintiffs so that Tax Investments may perfect unredeemed tax certificates. Accordingly, the FDIC has not breached the loan agreements as alleged in plaintiffs' complaint.

## II. SUMMARY JUDGMENT ON THE COUNTERCLAIM

The FDIC's counterclaim alleges that plaintiffs defaulted on the loan agreement with FSB. The FDIC argues that it, on behalf of Sun Savings, is a third party beneficiary of the Revolving Credit Agreement, the Revolving Credit Note, and the Guaranty, and thus may enforce the agreement even though not a party to it.

■ In order for a third party to enforce a contract, the parties to the contract must have intended that the agreement confer a benefit on him.[4] *Christensen v. Numeric Micro, Inc.*, 151 Ill.App.3d 823, 104 Ill.Dec. 843, 848, 503 N.E.2d 558, 563 (2d Dist. 1987). The express language in the contract and the surrounding circumstances at the time the contract was executed determine whether or not the contracting parties intended to benefit a third party directly. *F.W. Hempel & Co. v. Metal World, Inc.*,

721 F.2d 610, 613 (7th Cir.1983) (citing *Carson Pirie Scott Co. v. Parrett*, 346 Ill. 252, 178 N.E. 498 (1931)).

■ However, it is not necessary that the contract identify the third party beneficiary by name. Instead, the contract may define a third party by description of a class, and it is sufficient if the plaintiff may be identified at the time performance is due as a member of the class intended to be benefited. *F.W. Hempel*, 721 F.2d at 613–14 (citing *Altevogt v. Brinkoetter*, 85 Ill.2d 44, 51 Ill.Dec. 674, 421 N.E.2d 182, 187 (1981)).

■ Thus, in order to determine whether or not the FDIC is a direct third party beneficiary, the court must scrutinize the intent of the parties at the time they entered into the loan agreement. Sun Savings is not mentioned by name in the Revolving Credit Agreement, the Revolving Credit Note, the Security Agreement, or Harris' Personal Guaranty. While Sun Savings is mentioned in the Participation Agreement between Sun Savings and FSB, this is not the agreement to which the FDIC claims to be a third party beneficiary.

However, Paragraph 1.2 of the Revolving Credit Agreement specifically incorporates the terms and provisions of the October 13, 1983 Letter of Commitment from FSB to plaintiffs. Several provisions of that letter manifest an intent by both FSB and plaintiffs that the loan agreement confer a benefit on Sun Savings. Paragraph 9 states: "Borrower [plaintiffs] will provide First State Bank and Trust Company with a Participant who will take a ninety-five (95%) participation evidenced by a Participation Agreement satisfactory in all respects to First State Bank and Trust Company." Paragraph 10 states, in part: "All principle and interest will be due upon the last day of the thirtieth (30th) month provided, however, as and when each tax parcel is redeemed the total amount of sale: as shown on each Certificate of Purchase plus 14¼% ... shall be repaid to First State Bank and Trust Company and Partici-

---

**4.** The parties agree that this issue is governed by Illinois law.

pant...." Paragraph 14 states: "Upon receipt of the redumption (sic) monies ... [n]inety-five (95%) percent of the principal and interest shall be wired to the Participant and five (5%) percent shall be retained by First State Bank and the balance deposited in the Borrower's account."

These provisions, which the Revolving Credit Agreement states "shall be strictly adhered to," demonstrate that the parties, at the time of contracting, intended to secure a participating lender who would provide virtually all of the funds and, who, along with the lead lender, would receive repayment of principal and interest directly from the borrower in proportion to its participation in the loan. Participation by an institution at a level at which it is funding practically the entire loan is a significant factor in evaluating the intent of the parties to benefit the participant. A ninety-five percent participant is clearly benefitting from the income generated by the loan.

As stated above, it is not necessary that the contract identify the third party beneficiary by name. ·Instead, the contract may define a third party by description of a class, and the plaintiff may be identified at the time performance is due. While the provisions of the Letter of Commitment do not mention Sun Savings by name, the reference to "Participant" adequately describes the class of which Sun Savings is a member. The intent of the parties to benefit Sun Savings is significantly enhanced by the fact that Daniel W. Dierdorff, President and Chief Executive Officer of Sun Savings, is a co-signatory of the Letter. Thus, the Letter of Commitment, incorporated into the Revolving Credit Agreement, manifests the intent of FSB and plaintiffs to confer a benefit on a participant in the loan, in general, and Sun Savings, in particular.

The intent evident in the loan agreement is reinforced by the surrounding circumstances at the time the contract was executed. According to Harris, plaintiff initially approached Sun Savings, and not FSB, with the idea of funding Tax Investments. (Harris Aff., ¶ 4.) Plaintiff negoti-

ated directly with Sun Savings. Sun Savings expressed interest, but only as a participant. (*Id.*, ¶ 5.) This prompted Harris to approach FSB to act as the lead lender. (*Id.*) The Commitment Letter of October 13, 1983 reflects the mutual understanding of plaintiffs, FSB, and Sun Savings that FSB would be the lead lender and that Sun Savings would be a ninety-five percent participant. One month later, the loan documents were drawn up reflecting the understanding reached in the Commitment Letters. Thus, the court believes these circumstances indicate that the parties to the loan, FSB and plaintiffs, understood that Sun Savings would be the primary, although not lead, lender of the $1 million to plaintiffs.

Furthermore, the Loan Participation Agreement reveals the intent of FSB and plaintiffs to confer a benefit on Sun Savings. Paragraph 3 of the Agreement states: "We [FSB] sell to you [Sun Savings] and you purchase hereby a participation of ninety-five (95%) percent of our Loan to Borrower, which participation is equal to $950,000.00. Your participation shall be a continuing percental interest to the extent of your contributions in the principal amount of the Loan and the collateral." Although plaintiffs were not a party to this Agreement, the Agreement is dated November 18, 1983—the same date stated on the loan documents. The Participation Agreement is referred to in the October 13, 1983 Commitment Letter which was signed by plaintiffs, FSB, and Sun Savings. These circumstances indicate that FSB and plaintiffs were more than just aware of the benefits that Sun Savings would receive from the loan. Rather, the parties intended Sun Savings to play an integral role in the loan transaction, and thereby benefit from it.

Finally, the court cannot ignore plaintiffs' own allegations. In the complaint, plaintiffs set forth facts which reveal that plaintiffs intended to benefit Sun Savings. Paragraph 3 states "at some date prior to October 13, 1983 ..., the Plaintiff, HOWARD HARRIS ... reached an agreement with Sun Savings and Loan Association" in which Sun Savings agreed to be a ninety-

five percent participant. In Paragraph 5, plaintiffs allege that "Bank [FSB] acted solely as an accommodation to the Plaintiffs and Sun Savings and Loan Association and that fact is clear and conclusive from the contents of the aforesaid [loan and participation] documents.... [T]he Bank was in fact not the real party in interest other than to satisfy Sun Savings and Loan Association demand for a local financial institution to service the loan." Thus, it was the intent of plaintiffs, at the time of the loan and at the time of the filing of their complaint, that Sun Savings would be the primary lender, and thus benefit from the loan. The securing of FSB as lead lender was admittedly "solely ... an accommodation."

For these reasons, the court finds that Sun Savings is a direct, and not an incidental, third party beneficiary of the loan agreement between FSB and plaintiffs. It is undisputed that Tax Investments has not made any payments to FSB or Sun Savings on the outstanding loan balance since August 1, 1986. (*See* Rule 12(m) Statement, ¶ 20; Rule 12(m) Response, ¶ 20.) Under the Revolving Credit Agreement, the principal of and accrued interest on the outstanding balance is due and payable upon default for five days in the payment of principal and interest. (¶¶ 6.1(a), 6.2). Thus, plaintiffs are in default. As a third party beneficiary of this Agreement, the FDIC may enforce the default provision.

In summary, the court finds, as a matter of law, that FDIC did not breach the loan agreement by refusing to advance additional funds to plaintiffs so that plaintiffs may perfect unredeemed tax certificates. In addition, the court finds that Sun Savings is a direct third party beneficiary of the loan agreement between FSB and plaintiffs and may therefore enforce the default provision in the Revolving Credit Agreement.

**5.** The judgment amount reflects the FDIC's share (95%) of the outstanding principal ($477,-911.03) and interest ($417,923.22) owed by plaintiffs through the date of this memorandum opinion and order. Post-maturity interest has been calculated at an annual rate of 18¼%, as set forth in the Revolving Credit Note. The

CONCLUSION

For these reasons, FDIC's motion for summary judgment on plaintiffs' complaint and FDIC's counterclaim is GRANTED. Judgment is entered in favor of defendant FDIC and against plaintiffs Howard Harris and Tax Investments on the complaint. Judgment is entered in favor of counterplaintiff FDIC and against counterdefendants Howard Harris and Tax Investments on the counterclaim in the amount of $851,-042.53.[5]

judgment amount does not include the $50,000 pledged as collateral to FSB since the December 22, 1987 letter from counsel for FSB to counsel for the FSLIC indicates that the collateral will be used by FSB to satisfy its claim against plaintiffs. (*See* Harris Aff. ¶ 12; Defendants' Rule 12(m) Statement, Ex. L.)